Sylvia H. GEE, Plaintiff,

v.

Daniel J. BOORSTIN, Defendant.

Civ. A. No. 77–1628.

United States District Court,
District of Columbia.

April 28, 1980.

Shalon Ralph, Neil B. Katz, Chevy Chase, Md., for plaintiff.

John W. Polk, Asst. U. S. Atty., Robert A. Lincoln, Asst. Gen. Counsel, Washington, D. C., for defendant.

## PROCEEDINGS

BARRINGTON D. PARKER, District Judge.

In this litigation plaintiff, Sylvia H. Gee, seeks redress under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, *et seq.*). She charges the Library of Congress with racial discrimination during the course of her employment; that the Library maintained and sanctioned discriminatory practices and policies against her as a black and denied her promotional opportunities to which she was otherwise entitled. During the trial a number of witnesses were presented. Their testimony has been fully considered; their credibility carefully weighed and assessed. The Court has also considered the various trial exhibits and counsel's final argument.

After a consideration of the relevant testimony and evidence the Court determines that the Library of Congress has not rebutted plaintiff's allegations of discrimination. The clear, convincing and overwhelming evidence and testimony, worthy of belief, supports the plaintiff's cause of action, and she is entitled to appropriate relief. The Court's finding and conclusions are set forth in this bench ruling.

Mrs. Gee is a 50–year–old black female. She has been employed continuously at the Library of Congress for more than 24 years.

Before her employment she had several years of college work at Howard University, in this city, and subsequent to her appointment at the Library had pursued limited work at Maryland University.

Her cause of action under Title VII of the Civil Rights Act is against the Library's Chief Executive Officer, Daniel J. Boorstin. She alleges that she was the victim of discrimination based upon race and sex and reprisals during the course of her employment.

The present litigation arose when in 1975, she applied for a GS–10 supervisory position in the Searching Unit of the Catalog Publication Division.

She was not selected for that position and now claims that her rejection was based on racial and sexual discrimination, and that during the course of her employment she has been subjected to reprisals, harassments, and retaliatory measures arising because of her race and her sex and because of her involvement in efforts to eliminate discriminatory employment practices at the Library.

Mrs. Gee was first hired in 1956, as a GS–3 Library Assistant in the Copyright Office.

In October, 1962, six years after serving in the GS–3 position, she was then promoted to a GS–4 in the Union Catalog Division.

By the end of 1962, she received another promotion, to a GS–5.

In 1963, she was promoted to the position of Library Assistant (Searcher–Editor) GS–6.

In October of '65, Mrs. Gee was temporarily promoted to GS–7, Library Assistant in the Catalog Maintenance and Publication Division.

She became a Library Technician, GS–7, in January, 1968, and later she was promoted to a GS–8 Reviewer in August, 1974, in the Catalog Publication Division.

On August the 20th, 1975, the Library of Congress posted a notice seeking applicants for and announcing a position to be filled, namely, that of Supervisor, Searching Unit, in the Catalog Publication Division.

The posting set forth the minimum qualifications and requirements for an applicant's eligibility.

The qualifications and requirements were initially developed and written by an administrative assistant to the Chief of the Catalog Publication Division, who was not a personnel specialist, nor was she called by the Government to offer testimony as to her qualifications and experience or the bases upon which she developed material included in the posting. Testimony concerning this was supplied from other sources.

Later, what the administrative assistant had developed was reviewed and revised by Mr. Glen Zimmerman, who is now the Chief Personnel Officer of the Library.

At that time, Mr. Zimmerman was not in personnel, but, instead, served as an administrative officer elsewhere in the Library system.

After Mr. Zimmerman signed off, a final review was undertaken by the Personnel Office of the Library of Congress. At this point in time, Mr. John Reamy served as plaintiff's second line supervisor.

He was also the selecting official, and his selection or recommendation was submitted to Ms. Fay Wexler for final action.

Mrs. Gee applied for the position in question. At that time, she had been continuously employed in the Searching Unit since 1968.

She was among the several finalists considered, and was interviewed by Ms. Fay Wexler, the Assistant Chief of the Catalog Publication Division. Ms. Wexler is black.

A black male Library of Congress employee who was then on board was selected for the position. He declined and accepted a position elsewhere in the Library.

On November 25, 1975, the position was reposted.

Mrs. Gee was again considered, but an outside white female applicant who had no prior Library of Congress experience or employment was selected on March 15, 1976.

The testimony of the Government showed that the selecting officials had considered and determined that Mrs. Gee was not qualified for the supervisory position.

Despite that determination, however, she was not advised of the decision in 1975, but, rather, she was interviewed and otherwise led to believe that in the judgment of responsible Library officials that she was being considered in good faith and was eligible for appointment.

While the plaintiff's application was considered for the second posting, she was not interviewed in the second round.

The plaintiff immediately reacted to her non—selection, and on April the 8th, 1976, filed a discrimination case or complaint, based on race and sex, because of the Library's failure and refusal to promote her to the GS—10 position.

Her efforts to seek relief and redress at the agency level were denied, and this litigation then resulted.

The GS—10 position in question then became available in June, 1975, when Mr. James Goetz, who had been supervisor of the Searching Unit, and who was remarkably lacking in supervisory ability, was reassigned elsewhere in the Library because of employee dissatisfaction and criticism.

Mr. Goetz had served in the supervisory position for eight years or more and his supervisory deficiencies and problems were well known and documented by Library officials.

He had supervised the plaintiff continuously until his reassignment in June of 1975.

In January of 1975, a number of employees in the Searching Unit petitioned the Library in writing, expressing their grievances and opposition to Goetz's conduct and performance as a supervisor.

They alleged various types of harassment, intimidation, lack of sensitivity, improper attitude, and other problems long associated with his supervision.                    .

The Library was aware of Mr. Goetz's deficiencies, but because they regarded him as otherwise proficient and knowledgeable of his work, they made no move to correct a notoriously poor supervisory situation until the employees acted.

To resolve the problem, he was allowed "to resign" and I say that advisedly, and then he was transferred to another position in the Catalog Publication Division.

The new position to which he was assigned was at a GS—9 level as Assistant Editor.

Two aspects of this transfer are very interesting. First, it afforded him an increase in salary. But even more interesting, and somewhat puzzling, the next month he received a within—grade salary increase based on a certification of "an acceptable level of performance."

Indeed, by August, 1976, Mr. Goetz had secured promotion to a GS–11. The Government never afforded any explanation of these actions.

Mr. Goetz is white. He had been the plaintiff's immediate supervisor for more than five years prior to his transfer. Throughout that period their relationship was strained and the testimony shows that he and a second–line supervisor in the Division, John Reamy, also white, ignored and avoided plaintiff and treated her in a far different manner than other employees in the Searching Unit.

His performance evaluations portrayed her in a negative light.

Mrs. Gee had signed the protest petition against Goetz. The other signatories to the petition, with one exception, were all black.

In the period of the late 1960's, and particularly in the early 1970's, Mrs. Gee earned a reputation as an employee who was greatly concerned with racially discriminatory practices in the Library of Congress. Particularly during the period of the seventies, she was identified as a member of the Black Employees of the Library of Congress, otherwise known as the BELC.

She served as Public Relations Officer and on the Board of Directors of that organization. In general, she was an active participant in that organization, and in other union activities at the Library.

Her efforts and concerns were to upgrade and to improve the working conditions and the lot of black employees.

In the time frame of the early 1970's, the Library of Congress was not covered by Title VII of the Civil Rights Act. The BELC lobbied Congress for inclusion of the Library under Title VII. The Library officials resisted such efforts.

As a member of the BELC, the plaintiff, along with other BELC members, contacted the American Library Association and was instrumental in arousing that Association's interest in the problems of black employees at the Library.

A public hearing on problems of minority employment at the Library of Congress was also held. Mrs. Gee and others testified at the hearing.

This interest of the American Library Association was significantly important and of concern to the Library of Congress. In the Library's Annual Report for Fiscal Year 1972, reference is made of the Association's interests and concerns.

Mrs. Gee also served as a witness for other employees in discrimination hearings and otherwise interested herself in their problems and worked in their behalf.

The BELC was an officially recognized organization within the Library from 1973 to 1976. In 1976, the Library implemented a labor–management program and the employees of the Library voted a national labor union as its official representative. Mrs. Gee was active in that union as well.

In general, it is fair to say that Mrs. Gee was an outspoken employee, an irritant who stood up and presented unwelcomed challenges whenever she saw or suspected racial discrimination.

After considering the testimony of all the witnesses, it is appropriate to find from the facts and through reasonable inferences that management did not take kindly to her endeavors.

And, of course, the supervisory officials within the Catalog Publication Division were well aware of her activities, which caused them no little discomfort and displeasure.

The plaintiff's participation in BELC's activities and her challenge to the Library's employment policies were fully corroborated by Howard Cook, an officer of BELC. He also testified that in his opinion Mrs. Gee was the target and victim of racial discrimination and reprisals because of her activities.

There were two postings for the GS–10 supervisory position, August 20, 1975, and November 20, 1975.

The postings listed several factors required of the applicants. All are important in analysis of Mrs. Gee's treatment.

One item was demonstrated supervisory ability or potential, good knowledge of cataloging and filing rules, and physical ability to search the Library of Congress catalogs for long periods.

Another item was a graduate degree in Library Science, plus one year of relevant experience, or a Bachelor's degree with three years of cataloging or pertinent searching experience in a research library, including one year at grade GS–9, or equivalent.

A third item was reading knowledge of one modern Western foreign language and knowledge of a second one sufficient to recognize bibliographic terms.

The posting also provided that unless otherwise indicated, an adequate amount of additional experience or training, as appropriate, might be considered in lieu of qualifications specified.

As to qualifications, the Court finds that from 1963 to 1975, Mrs. Gee had gained a solid and basic knowledge of the various facets of the necessary technical requirements of a senior searcher through her several years of service.

She had a firm grasp and understanding of the several areas of work undertaken in the Searching Unit.

The Court also finds that the plaintiff had supervisory potential.

While Mrs. Gee had only served under limited circumstances as a supervisor, the testimony of her several co–workers and a supervisor showed that she had some such experience and had potential, if given a fair opportunity.

The Government, in exercising its discretion as to whom to call as witnesses, and understandably so, did not call James Goetz as a witness. He was the supervisor under whom plaintiff and others in the section had experienced a variety of difficulties and problems.

But, even after consideration of all the testimony mustered against Mrs. Gee, even if she was lacking to the extent that the Government claims, it is difficult to sustain and declare that by any standards she would have been as inadequate and created the problems faced by Mr. Goetz.

The basic educational requirements were either a graduate degree in Library Science or a baccalaureate degree. Cataloging and other relevant searching experience was also required.

The Court notes that Jim Goetz, the supervisor of the Searching Unit, and John Reamy, both of whom served as plaintiff's first and second-line supervisors, had pursued no more college work than had the plaintiff.

At this point, the Court notes parenthetically that the testimony concerning the vast majority of black women identified within the Catalog Publication Division showed that although they had college degrees, as compared to Goetz and Reamy, they seldom if ever served in a supervisory position. They only served in assistant supervisory positions.

A great deal of attention and testimony was directed to the fact that the plaintiff did not meet the one–year–in–grade requirement as a GS–9. That requirement is mandated for employees of the Executive Branch of the Federal Government by the Whitten Amendment.

At the time of the plaintiff's grievance, the Library was not subject to the Whitten Amendment, or requirement.

The testimony showed that while the Library had no official or specific time–in–grade regulation, it did have guidelines which had been published in 1968, and before.

The provisions of the guidelines to some extent paralleled the Whitten Amendment. Despite this, however, exceptions and waivers had been made.

The Government never presented any document or exhibit explaining the conditions and circumstances under which exceptions and waivers had been made.

Tyrone Mason and Glen Zimmerman, ranking personnel officials of the Library, were called as witnesses for the Government. They testified that a number of true

waivers of the time–in–grade requirement had been made prior to Mrs. Gee's application. In most instances they were unable to show the full circumstances of the waiver.

Mrs. Gee has insisted throughout that a waiver could have been exercised in her case. The Court agrees, even in view of the fact that the referenced waivers were very limited in number.

Mr. Mason testified that no specific criteria were used in the Library in the waiver of the time–in–grade requirement, and that in 1975, there was no regulation in effect as to waivers.

Mr. Zimmerman testified that in March '79, well after Mrs. Gee's complaint was presented to the Library, an official regulation relating to the time–in–grade requirement was implemented.

The 1979 regulation cannot, however, affect Mrs. Gee's present complaint and application for relief.

And the Government has not demonstrated why Mrs. Gee should not have had the benefit of the waiver exception.

The posting listed as language requirements a reading knowledge of one modern Western foreign language and knowledge of a second language sufficient to recognize bibliographic terms. It was abundantly clear from testimony of every knowledgeable witness who commented on this requirement, that the so–called "reading knowledge" of a language was unnecessary and exaggerated.

A basic knowledge and understanding of the alphabet, ability to identify an author, bibliographic terms, and a knowledge of a limited number of articles and words was more than adequate.

Mrs. Gee had acquired this knowledge on the job for 12 years. While she did testify that her reading knowledge was limited to Spanish and Russian, portions of the official administrative record bearing the signatures of supervisory Library officials indicate clearly that she also had knowledge of both German and Latin.

Moreover, the testimony of Mr. Neverdon, whom I later identify, and others indicated that it was a long established policy within the Unit to assign work requiring special language skills to designated persons. This assignment was usually made by John Reamy.

Four workers in the Searching Unit were called as witnesses to support plaintiff's claim. Jenifer Lockhard, Geraldine Duncan and Victor Martin were peer employees. A fourth, Leroy Neverdon, was plaintiff's supervisor at the time she applied for the GS–10 supervisory post. Martin was white; the other three were black.

The witnesses Lockhard, Duncan and Martin joined the Searching Unit several years after the plaintiff. Neverdon joined the Unit within several years before the plaintiff filed her administrative complaint. All four were in daily contact with Mrs. Gee and had ample opportunity to observe and work alongside her on a daily basis.

They also had equal opportunity to observe the general work environment and conditions and the interaction between the plaintiff and her co–workers and the plaintiff and her supervisors.

The Court had full opportunity to observe the four during their appearance as witnesses. They gave straight–forward non–evasive and unequivocal testimony. The Court finds them to be worthy of belief.

Each was asked whether they had ever seen or had reason to believe that any racial or sex discrimination was exercised against the plaintiff by her supervisors. Their answer, while in some instances hesitant and labored, was generally in the negative.

The co–workers testified without exception that Mrs. Gee was a knowledgeable and experienced searcher, that she enjoyed a reputation as such in the Searching Unit; that they and others had often sought her out when difficult problems arose in their work assignments; that plaintiff was cooperative, helpful, and shared her work skills and experience with others, and often assisted and helped them with their assignments and responsibilities in the Searching Unit; that on various occasions she supervised them, in the absence of the regular

unit supervisor, on a rotating basis with other senior supervisors, or senior searchers.

The Court gives considerable credit to the testimony of Leroy Neverdon because of his supervision of the plaintiff. He served as Mrs. Gee's supervisor for the two–year period immediately prior to her filing for the GS–10 vacancy.

He served in the Unit first as an assistant supervisor and later as the acting supervisor.

When he joined the unit he testified that he was unfamiliar and inexperienced with the work. Mrs. Gee was helpful and assisted in his gaining knowledge and a toe–hold on the work.

He testified that she was one of four GS–8 searchers in the unit; and that the quantity and quality of her work was most satisfactory; that she understood and was knowledgeable of the important technical requirements; had good relationship with the lesser grade employees, whom she assisted at times.

Neverdon rated her performance as a GS–8 searcher as "B–plus" and considered her and another as the best of the four GS–8 employees in the unit.

He felt that, as he testified, that she could have performed as a supervisor, at least as assistant, a position which he had held and which she had sought but was denied.

He further stated that based on his two years as a supervisor in the unit, a college or library degree was not required.

Neverdon had two degrees, both in the field of business administration. As indicated, neither Goetz nor Reamy, who were his supervisors at one time, had a baccalaureate degree.

He further stated that no more than a working knowledge of the alphabet of foreign languages was necessary.

While Neverdon was the plaintiff's immediate supervisor in the two years prior to her applying for the GS–10 position, no one in the Union Catalog Division sought his first hand and current view of Mrs. Gee's performance and abilities.

When asked by the Court why no one sought Neverdon's views, the Government witnesses replied that it would have been inappropriate since the plaintiff was applying for the position that Neverdon in fact was occupying.

That answer is totally unacceptable because the top line officials in the Division knew that Neverdon did not want to stay and did not intend to file for the GS–10 position.

The Government called Virginia Ezell, a former co–worker, to show that plaintiff's past performance failed to measure up to expectations. Her testimony, however, was flawed in several important respects.

Indeed, Mrs. Ezell worked in a different section and lacked daily contact with Mrs. Gee over the relevant period, 1970 to 1975.

While in an earlier period, 1966 to 1970, she had served first as a co–worker and later, from 1968 to 1970, served as her assistant supervisor, from 1970 to 1975, Mrs. Ezell worked in the Editorial Unit, which was entirely separated from the Searching Unit. She was, therefore, in no position to testify from first–hand knowledge relevant to the important period.

She did testify that in 1977, for a short period, she was detailed to the Searching Unit, but this was after Mrs. Gee had filed her administrative complaint and was still attempting to seek redress from her allegations of discrimination.

Beyond the lack of contact for the 5–year period, 1970 to 1975, Mrs. Ezell's in–court testimony was lacking and suspect because it differed in significant respects from her earlier testimony at the August 15, 1978, administrative hearing. Her several attempts to reconcile and justify her testimony at that hearing were at best feeble and unpersuasive.

The trial testimony revealed that during the time of Mrs. Gee's employment, the Director of the Division, Ms. Gloria Hsia, retained in her office a "division" file on the plaintiff. This folder was other than the regular official personnel file main-

tained on a government employee. This division file not only included matters which related to and would be relevant to her then current employment, but also included matters dating back to 1967, well before the time Mrs. Gee applied for the GS–10 supervisory position.

Included in this division file were a significant number of memoranda developed by the plaintiff's line supervisors, Goetz and Reamy, with whom she had had long existing problems.

The administrative record included more than 50 pages of such memoranda. With few exceptions, all could be characterized as derogatory and critical of Mrs. Gee and pointed to her problems and deficiencies as seen by Goetz and Reamy.

Ms. Hsia did testify about a merit certificate awarded plaintiff. That certificate, however, was not included within her division file but was included elsewhere in the administrative record.

Mrs. Gee last received a promotion in August, 1974, when she was elevated to a GS–8 reviewer. Nonetheless, the division file of derogatory and negative statements contained memos dated long before even her last 1974 promotion.

The Court finds that the memoranda played a part in management's non–selection of the plaintiff for the GS–10 position.

Ms. Fay Wexler was the division official responsible for accepting and acting upon the choice of the selecting officer. She acted on the recommendation of John Reamy, who was the selecting officer.

She had never supervised the plaintiff, but she had knowledge of the plaintiff based on the reports of Goetz and Reamy, which were included in the division file.

She also, during her testimony, specifically referred to a 1973 memorandum in the file relating to a conference with the plaintiff in which she, Goetz and Reamy had participated.

That memorandum related to a supervision problem between the plaintiff and her supervisor, Goetz. In that connection, she further admitted that she had the benefit of and was familiar with other memos in the file.

The implications of the division file are most important, for one of the several grievances of employees against Mr. Goetz, enumerated in the January 1975 petition, was that "Mr. Goetz deliberately discredits employees seeking better positions elsewhere by submitting false statements in evaluating their performance."

Also, "He employs the performance rating system as a method for discriminating against members . . . ."

On redirect examination, Ms. Wexler attempted to lessen the impact of her earlier testimony as to her familiarity and use of the file in a supervisory selection, but in doing so, her credibility was likewise lessened.

It stretches common sense to suggest, as she later testified, that the files did not affect or influence her final determination. To do so is to blink at reality.

Management claims that such files were maintained on other employees and that they were available at any time for examination by the employee involved. That explanation is inadequate and insufficient insofar as it relates to Mrs. Gee's Title VII complaint considering the nature and circumstances of her case and the record of her long involvement as a black in challenging discriminatory employment practices at the Library.

The division file, containing documents and referring to incidents 10 years or more remote in time was wrongfully and unlawfully maintained by the division chief. It served no useful purpose. The contents of the file were used to the plaintiff's detriment and disadvantage in her efforts to seek the GS–10 supervisory position.

That the files contained negative and derogatory comments by her supervisor cannot be ignored within the context of this employment discrimination case based on race.

Ms. Hsia and others defended the maintenance of the division file as not violative

at the time of any agency policy. That, of course, affords no justification for the manner in which the Court finds it was used here. The introduction of a new agency policy growing out of this case curbing the use of such files is indicative of a belated recognition of its abuse against Mrs. Gee.

Management also makes the point that a division file was maintained as to all employees, but all employees were not comparable to Mrs. Gee, a black activist.

There is no dispute that Mrs. Gee's first and second-line supervisors, as well as the higher officials in the Union Catalog Division were well aware of plaintiff's participation in the BELC. For many years she had taken a public stand against discrimination against blacks in the Library of Congress.

There is little doubt that at the time that she was engaged in an up–hill battle, she was raising issues and asking questions which put her career as a Library employee and her prospects for further advancement in jeopardy. She spoke out and questioned her supervisors about work and related matters which were not clear and which she considered improper. To management she was a trouble–maker, a constant irritant, and scarcely a candidate for the most–liked employee by any supervisor or official in her Division. In short, she was a burr under the saddle.

Racial discrimination and discriminatory employment practices may be manifested in various forms. The time has since passed and it is no longer a common occurrence to find in either the public or private sector of employment, situations where discrimination is openly proclaimed or blatantly practiced. Racial discrimination and discriminatory employment practices may also be exercised in subtle, veiled, disguised forms. The consequences of such practices, however, are the same. The impact is nonetheless recognized and felt.

This was the situation that confronted Mrs. Gee in the early 1970's and in the mid–1970's when she sought the GS–10 supervisory position.

To summarize, in 1976, when Mrs. Gee was not selected for the GS–10 supervisory position and when she filed her administrative complaint, she was a victim of racial discrimination.

She was a black activist who had earned the disfavor of management.

The fact that Leonard Scott, a black, was first selected for the GS–10 supervisory position does not weaken or detract from her claim. There was no showing that Scott was a black activist, as was the plaintiff.

Nor does the fact that the ultimate responsibility for acting upon the recommendation of the selecting officer was made by a black, Ms. Wexler, weaken or detract from the plaintiff's claim.

The plaintiff has demonstrated she was qualified by experience, that she had a solid understanding and broad knowledge of the basic operational aspects of the GS–10 position.

The testimony also shows that she possessed supervisory potential.

The time–in–grade requirement as a GS–9 was not mandatory. It was artifically imposed as a bar to avoid favorable consideration of Mrs. Gee. The so–called requirement was indeed not an official regulation, but rather a practice that could be and had been waived, even if only in a limited number of cases.

Mr. Tyrone Mason, a qualified and experienced personnel officer of the Library, called as a government witness, candidly testified and admitted that except for the time–in–grade requirement as a GS–9, Mrs. Gee was minimally qualified.

Leroy Neverdon, who supervised the plaintiff for a 2–year period immediately before she applied for the position, also gave testimony supporting her qualifications.

Goetz and Reamy, Mrs. Gee's immediate first and second-line supervisors, were sensitive to and resented her participation as an activist.

Her first-line supervisor, Goetz, was a discredited supervisor, but nonetheless, his

negative performance evaluations and memoranda followed Mrs. Gee in the Division file and were used against her to her detriment.

Management's position that a baccalaureate degree and a degree in Library Science were the qualifying factors for a person to be classified as a professional librarian pursuant to the Classification Manual is belied by the fact that Goetz and Reamy are now classified as GS–11 and GS–12 respectively. Neither possesses a college degree and neither has any more credits toward a college degree than the plaintiff.

When Goetz was first promoted as supervisor of the Searching Unit, his experience was considered as a substitute for a lack of his college degree. Mrs. Gee was denied a like opportunity for her experience to be considered as a substitute.

The Court concludes that it has jurisdiction over this employment discrimination proceeding based on race under the provisions of Title VII of the Civil Rights Act of 1964.

Mrs. Gee has exhausted her administrative remedies.

Mrs. Gee has presented a prima facie case of discrimination and has demonstrated by a preponderance of evidence that despite her qualifications, she was denied a promotion to the position of Supervisor, Searching Unit, GS–10.

Her denial was based on racially discriminatory practices exercised against her by the Library of Congress.

She was subjected to discrimination and reprisals because of her race and because of her continued and known opposition to unlawful employment practices against blacks as reflected by her activities in the BELC.

She was not selected for the GS–10 supervisory position she sought because of discriminations and reprisals by Library personnel.

The Library of Congress has failed to rebut the evidence presented by the plaintiff and has not demonstrated that her race did not influence the decision denying her the GS–10 position.

The qualifications and requirements for the GS–10 position were not clearly demonstrated to be job–related. In any event, Mrs. Gee by competent testimony was regarded as minimally qualified.

The Library has failed to explain and justify the disparate treatment afforded plaintiff as compared with her two immediate supervisors, Goetz and Reamy, with whom she interacted during the period of her active participation in the BELC.

These findings and conclusions will be transcribed, filed immediately, made a part of this proceeding, and shall constitute the Court's findings of fact and conclusions of law pursuant to Rule 52, Federal Rules of Civil Procedure.

The plaintiff has met the criteria for appropriate relief established by the Supreme Court in *McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Mrs. Gee is entitled to and is granted judgment against the Library of Congress.

An order granting the plaintiff appropriate relief will be entered.

Counsel should submit an application, a memorandum in support of a claim for attorneys' fee.